TISON vs. LABEAUME.

If a bargain be such as no man in his senses, and not under delusion, would make on
the one hand, and as no honest and fair man would accept on the other, it will be re-
lieved against; but if the parties be competent to contract, and neither takes any undue
advantage of the other, it will not be disturbed.

## APPEAL from the St. Louis Circuit Court.

WILLIAMS, for plaintiffs in error.

Two propositions were submitted:
I. That Mrs. Tison and Mrs. Debetre were, in 1836, when their deed was obtained for
$100, the owners of one-half of the land therein described; which was worth at that time
$20,000 or $30,000.
II. That the inadequacy of consideration, with the circumstances surrounding and influen-
cing the grantees, was fully sufficient to insure the relief sought.
First proposition. The land was originally Paul G. Kircereau's. Livre Terrien, No. 2,
p. 34.   It was sold at public sale in 1779, and purchased by Francis Delorier, the father of
complainants, who was at the time a married man.   This sale was legal and valid.   8 Pet.
308.   Delorier being a married man, by virtue of the Spanish law then in force here, his wife
took one-half of the land.   Savenat et al. vs. LaBreton et al.   1 La. R. 522; Picott vs. Coo-
ley et al. 10 Mo. R. 312.
On the death of Mrs. Delorier in 1802, her interest descended to her children, Mrs. Tison
and Debetre.   Bronssard vs. Bernard, 7 La. R. 222 ; Savenat vs. LaBreton, supra; Saul vs.
his creditors, 5 Martin. N. S. 580; Davidson vs. Stewart et al. 10 La. R. 148; Partida and
10 Mo. R. 312.
The land was confirmed by act of Congress of 29th April, 1816, to Paul G. Kircereau's

Tison vs. Labeaume.

legal representatives. At that time they were Louis Labeaume for one half, and Mrs. Tison and Debetre the other half, in this way.

In 1808, after the death of his wife, Francois Delorier sold the tract to Louis Labeaume, and conveyed it by deed. That deed transferred only the interest of Delorier. The community that had existed between himself and wife, was dissolved at her death, and he could not sell and convey her interest, for it had descended to her children. Broussard vs. Bernard supra.

The confirmation did not, as has been contended by defendant's counsel, put the title into Labeaume. It is true that he presented the claim to the recorder; but, as claimant, he occupied an entirely different position from those presenting their claims before the boards of commissioners, under the acts of 1805, 1807 and 1832.

Then, in 1836, Mrs. Tison, and Mrs. Debetre and her husband, were the rightful owners of one half of the land described in their deed to Susan Labeaume. These old ladies were both married prior to the change of government, and remained femes covert till four or five years ago; so that no laches could be imputed to them.

Mrs. Tison held her position in her own right, her husband having but a life estate, from the fact that they had no marriage contract creating any community, and the law created none in paraphernal property.

A succession, accruing to the wife during coverture, is paraphernal property, and without a marriage contract so directing and controlling, does not enter into community. Flower vs. O'Conner, 8 Martin, N. S. 556.

Mrs. Debetre and husband had a marriage contract, which, by its terms, created a community in all property held or to be held in any way; so that they owed her one-fourth jointly. Picott vs. Coley, 10 Mo. R. 312.

From this view of the case, Mrs. Tison owned one-fourth of the whole tract of land conveyed in 1836, in which her husband had a life estate, and Mrs. Debetre and her husband owned another fourth jointly.

Second proposition. Was the deed of those old women to Susan Labeaume obtained fraudulently? Was there fraud in fact, or such presumption of fraud as to vitiate the deed and reinstate the parties?

1st. Was there fraud in fact used in its obtainment? I think so, for the following reasons: Louis A. Labeaume, the son and agent of his mother, to whom the land had been devised by her husband in his answer to the bill, acknowledges that he had been informed of the defect of title by Josiah Spalding esq., but that he believed the title was good in his mother. At all events, he thought so little of it that he took no steps to perfect matter from May or June till October. At that date, he drew up a deed at St. Louis, in the English language, and went for the first time in his life to see the old women. When he reached Florisant, where they lived, what took place? He saw the old ladies, Mrs. Tison first, whom he got the consent of, to Tison for ten dollars. But on going for Mrs. Debetre, she thought he should pay them more, as they were very poor. At last, after talking some time, out of charity, he agreed to pay them $50 each. In the interview, he represented to them that the land had been sold by their father to his father, but that the deed was defective. That their deed would be worth nothing to him; that they had a mere shadow of claim; that he only wished to save litigation; that theirs was a mere pretence which he wished to purchase; read the deed and explained it to them just as it was upon its face, &c. He heard the old women appeal to their husbands, and they answered that it was their own matter—"do as you please," and he opened not his mouth. He told them that the defect in their father's deed was such as might be cured by a suit, but that he did not want to sue them, &c. I hardly state the conversation as strongly against him as his answer sets it out, but it seems to me sufficient to fix upon him the charge of fraud most indubitably. He knew that Tison was entitled to a life estate. He knew Debetre was entitled to half of his wife's interest, and yet he was silent when they said there was no interest whatever in them. 1 Story Eq. Ju. 197, and following; East vs. Matheny, 1 A. K. Marshall, 192; Shackford vs. Handley, 1 ibid, 500; Belcher vs. Belcher, 10 Yer-

ger, 121; Lewis vs. McLemore, ib. 206; Harding vs. Randall, 15 Maine R. 332; McConnell vs. Wilcox, 1 Scam. 365; Bryan vs. Primm, Breese, 33; Waters vs. Mattingly, 1 Bibb. 244; White vs. Flora, 2 Tenn. R. 429; Smith vs. Richards, 13 Peters, 26; Needer vs. Fonda, 3 Paige; 94; Livingston vs. Penna. Iron Works, 2 Paige, 390; Woods vs. Hall, 1 Devx. Eq. 411.

2nd. But if there were no fraud in fact, are you not forced to presume it from the circumstances of the case? Inadequacy of consideration alone, if so gross as to shock the conscience, or make one exclaim, no one in his senses would have made such a bargain! will be sufficient to set aside a deed, unless explained.

Here the inadequacy was erroneous—one hundred dollars paid for thirty thousand dollars worth of land, I Story Eq. In. 250, &c.; 2 Kent's Com. 482; 2 John. C. R. 1; 14 John. R. 527; 4 John. Ck. 118; 3 Cowen, 445, 518, 537, 590; Gilman, 230; 2 Root, 216; 3 McLean, 332; 1 Dessussure, 250; 2 ib. 636; 3 ib. 292; 4 ib. 652, 687; 9 Cond. Eng. Ch. R. 65; 1 Starkie, 352; 1 Bro. C. C. 68; 2 ib. 167–75; 10 Vesey In. 209; 2 P. Wm. 293; 7 Bro. Par. cases, 70.

Although from mere inadequacy when very gross, fraud will be inferred, yet it is a stronger case where other circumstances are connected with it. 6 Har. and John. 435; 21 Maine, 474; 7 Law Repr. 100; 1 Munford, 557; 1 Munford, 519; 2 Litt. 118; 1 Atkins, 301; 1 Vesey, 503; 2 ib. 161,257,155; Car. Temp. Talb. 111; 2 Vesey, 155; 1 Bro. C. C. 124; Hill vs. Tuntier, 152; and the cases before referred to, and particularly the great case in 3 Dessaussere, 292.

In no case of the hundreds that exist, have the circumstances surrounding the parties been such as to call more loudly upon a court of equity for relief, than in the one at bar. The purchaser had the advice of distinguished counsel—was a man well educated and highly intelligent—a man remarkable for his shrewdness and ability to manage his affairs—was wealthy and influential, and he sought out parties whose deed he procured for the very purpose of getting it. The grantees were married women—very old, one of them 65, the other near 70 years old. They were very ignorant—could neither read nor write, nor could they speak any language but the French. They were certainly induced to make the deed by the representations of Labeaume. They were not told that they had any estate in the land, &c., but were induced to believe that theirs was a mere shadow, a pretence. Nor did the husbands know that they had any interest whatever in the property; whereas one had a life estate ten times more valuable than the amount paid for the fee. The other owned one-eighth absolutely, and yet neither of them got a cent. They were not told to consult counsel or friends, but to come into town and acknowledge the deed, and they would be paid. They came, and during that visit they were with Labeaume all day—dined at his mother's where they had never before been seen, and those with whom they had always before stopped saw nothing of them. No such case, taken in all its phases, can be found on record.

But in conclusion, if there was no fraud in fact, and fraud will not be presumed from the inadequacy of consideration and disparity in condition and position of the parties, ought not the deed to be cancelled on the ground of mutual mistake?

The old women certainly made their marks, confiding in the representations of Labeaume, which were all false, whether he knew they were or not. Mutual mistake is good ground for relief. See the cases before referred to, and the strong case of Daniel vs. Mitchell, 1 Story R. 172. In any and all views of the controversy, it does appear to me that the court are forced to grant the relief sought. I say forced, for unless they are in a measure compelled to do so, I know the difficulties that environ the administrators of the law.

You have great desires to keep claimants in possession of their lands, and in all such cases as this, the influence of wealth and family is necessarily felt, and too often has controlling effect upon the bench—the judges being but poor, frail mortals at best.

It seems to me however that there is not a case where any appeal can be successfully made in favor of defendants, on the ground that it is upsetting their titles, and such like scare-crow

argument, too often resorted to in the halls of justice, but better suited to frighten others than those whose motto should be *"ita lex scripta est."*

If the Labeaumes now surrender one-half of the land still in them, which is all we ask, and pay one-half of the money which they have received from sales made, deducting the amount which the old women received, with interest, are they not just where they were before? They do not stand before the court innocent purchasers for a full consideration, and now attacked by an unknown outstanding title, but as those who obtained from complainants the vauluable land in consideration for nothing. If they are compelled to give it up, how are they entitled to the sympathy of any one? We only ask for what is ours, what has ever been, and with which we never parted, connusant of our rights.

## Haight, for plaintiffs in error.

I. That a community existed between Delorier and wife, and the land in question having been purchased during the existence of the community, the legal presumption is that it belongs to the community. That it was part of the "acquits and coquets." On the death of the wife her share, being one-half of the real estate, descended to two heirs. Picotte and others vs. Cooley et al. 10 Mo. R. 312, affirms the same doctrine in the heirs and Lindell.

II. The confirmation under the act of April 29, 1816, is a grant to the claimants mentioned in the report of the recorder to congress, and to no other persons. The act confirms and refers to the report to ascertain the persons to whom the grant is made and the locality.

It is the law of congress which gives the estate, and whether granted in a case where the recorder had or had not jurisdiction is of no consequence. All depends upon the law, and if that ascertains the claimant, there is an end to the question as to who was to be the grantee. The report of the recorder is referred to for the express and only purpose of designating to whom the grant is made, and the thing granted. This report presented the representatives of Kircereau as the claimants. Congress had no information before them as to who had appeared before the recorder in behalf of these representatives, and are not presumed to know upon what evidence, or at whose instance the report was made. The tabular statement in evidence was all they had on the subject, and is it not strange that it should be said that congress intended and did grant the land to the man who appeared before the recorder and filed a notice, but who was not reported as a claimant? How do we ascertain from this record that the notice and claim of Labeaume was the only notice and claim presented to this land? State Papers, vols. 3, 277; 5, 735; Villeer under Vasques; 2, 559, Chouteau rep. of Kircereau.

III. Inadequacy of compensation is always evidence of fraud, imposition, pride or mistake. The evidence is more or less controlling, as the inadequacy is greater or less in reference to the subject matter of the contract. It may be so gross as to be evidence *per se* that the contract or deed should be vacated. It may only be a circumstance to be taken into consideration with others to ameliorate the real equity of the transaction.

Inadequacy of price is not a ground for relief as a principle. It is only used as evidence, and its controlling character as such must always depend upon the circumstances of each case.

Great inadequacy is the basis. We find that, and then we look to see whether the parties were on equal terms, what were their relations; whether confidence was refused, &c.; whether they understood their rights; whether there was great ignorance and perhaps imbecility on one side, opposed to sagacity, business knowledge in general and information as to the particular subject of negotiation on the other. In all cases where the evidence shows great inadequacy and great disparity in the suffering party by reason of ignorance or imbecility, or age or infirmity, the whole will be set aside. 1 Brown chan. cases, 558, Gastside vs. Ishernvor; 2 Brown chan. cases, 167, 75 note, Heatheste vs. Baignon ; 4 Dessaussure 652, 87, Butler vs. Hashell.

IV. Where one party makes a representation of fact upon the faith of which the other acts, it is immaterial in a court of equity whether he knew its falsity or made the assertion without knowing whether it were true or false, and a conveyance of land obtained by said false representation is void. 15 Maine, 332; Hareling vs. Randall; 10 Gerger 206, Lewis vs. McLemone; 1 Story's Circuit Court Rep. 172, Daniell vs. Mitchell; 1 Story on Equity, secs. which treat at large of mistake, &c.

V. The evidence of the defendant, if it prove anything, proves a case of confirmation under the act of 13th June, 1812. The evidence there taken was of cultivation and inhabitation prior to 1803. The opinion of the recorder is founded on the evidence of possession, inhabitation, &c., under the act of 1812, and that was proved by John B. Ortes. See transcript, page 202.

## Spalding & Shepley, for defendants in error.

I. The confirmation vested the title of the land in dispute, in Louis Labeaume, assignee of Delorier, and there was, therefore, no title existing in Mrs. Debetere and Mrs. Tison at the time they conveyed to Mrs. Labeaume, and that deed cannot, therefore, be impeached, as having been obtained by misrepresentation, or for an inadequate consideration, or by taking advantage of the ignorance or imbecility of the grantors.

On Nov. 30th, 1812, Louis Labeaume filed his notice with the recorder of land titles under the act of congress of 13th June, 1812, stating the nature and extent of his claim, and claiming the land in question, 3 by 40 arpents, as assignee of Francois Delorier, who was assignee of Paul Gegorne Hieveume, original claimant according to the concession, and the ...... conveyances. With this notice he at the same time filed the concession and the deed Threenan to Delorier, and of Delorier to Louis Labeaume, each of which purports to convey the full title of the whole tract absolutely. The deed to Delorier was in 1779, and the deed to Louis Labeaume was on 5th July, 1808, with general warranty. The recorder took proof of possession, which of course has no effect in this suit as evidence, further than as to the bare fact that he acted on the claim, and then entered in his minutes "confirmed to be surveyed." In his report to congress he enters this claim, referring to livre terrien, No. 2, and the page, stating the notice to the recorder to have been given by "Paul G. Threenan's representatives," and his opinion on its merits, in these words, "confirmed 120 arpents to be surveyed." The act of Congress of 29th April, 1816, ratified this report and passed title to the confirmees.

The grand question here is, in whom did the title vest? In other words, who is the representative of Threenan, as to the title of this land?

The defendant gave this notice and the acknowledging deeds and the action of the recorder in evidence certified as being a full and complete transcript of everything touching that claim in the office of the recorder.

I. This claim not having been presented according to the requirements of the acts of congress, previously, everybody was barred on the 1st July, 1808. See Acts of congress, 2nd March, 1805, sec. 4, and March 3d, 1807, sec. 5.

The construction put upon these acts by the courts, has been that the claimants of inchoate titles were entirely cut off, and the land became free from any lien or right they might have had in virtue of a concession or survey under the former government.

The circuit courts of the United States for Missouri, (Judges Wells and Catron) have more than once so declared the law.

Strother vs. Lucas, 6 Peters, 770. Held by superior court of the United States, that the penalty of the said acts of 1805 and 1807, operated to bar all claims by any person who should have failed to file his notice and title papers as required by the act. In this case the words of the act are literally carried into effect. This was a case of two independent claimants of the same title, by conveyance, and one of them had filed his notice and documents, and obtained a confirmation by the board of commissioners in 1810.

## Tison vs. Labeaume.

12 Peters, 412, Strother v. Lucas, same case in the supreme court of U. S., a second time. Held, that a confirmation of the board enures only to the benefit of those who have filed claims and complied with the laws—p. 448. That the penalties for not filing the claim and notice is justified by sound policy and principles, and has always been enforced by the court; p. 434. " Widow Chanceller, not having filed her claim within the time limited by law, she could not set up any claim under any act of congress, or be permitted to give any evidence thereof in any court, &c."—and p. 455-6, "the plaintiff can neither have any benefit from any act of congress, nor give evidence of his claim against the defendant, claiming by grant from the U. S.

In this case, (the second time before the supreme court of U. S.) the plaintiff gave in evidence confirmations by the Recorder, ratified by the act of 1816; and the defendant gave in evidence a confirmation by the board of commissioners in 1810. At p. 458 of the same case, the court declared that the confirmation cannot enure to the benefit of others, than those to whom the board confirmed; and they declare that all those acts intend the confirmation to be to the claimant filing his documents and notice, &c.

2 Howard, 344, Choteau v. Eckart. That confirmations by the boards or recorder, &c., are acts in nature of succession to the intendant; that the treaty imposed only a political obligation to confirm the recipient titles, that this obligation cannot be noticed or enforced by the courts, and that the confirmation is not merely a quit claim to whomsoever it might concern, but a decision between conflicting claimants; that each claimant depended upon the justice and comity of the governments.

4 Howard, 449, Kaire Nichole Des Bois vs. S. Bramwell—same doctrine as above; p. 459. 60-61: "it has been the customary construction and practical understanding of the treaty for forty years, that claims like the plaintiff's (inchoate title) had no standing in a court of justice, until confirmed by congress or by its authority"—p. 462, the confirmation of 1836 cannot extend back by relation; if the sovereign power wronged the party, there is no remedy in a court of justice. 8 Howard, Bissell v. Penrose.

2. All claims not filed being barred, and there being a confirmation on the reports of the recorder, by act of congress, in 1816, such unfiled and unrecorded claims have no standing in court, as against the confirmation.

3. So that the claim of Mr. Tison and Mrs. Dehetere, children of Mrs. Deloriere, cannot be admitted, as their claim never was (nor was their mother's claim ever) filed or presented to the board or recorder, according to the requirements of the acts of congress.

4. Their claim (which originated under the Spanish government,.as their mother died, according to the testimony of Smith; a year or two before the change of government) was adverse to that of Louis Labeaume, and to the title purported to be conveyed by Mr. Delorier, in his deed to Louis Labeaume, "a tract of land of three arpents in front and forty in depth, situate in the prairie, &c "; and then follows a warranty against all evictions, donations, hypothecations, dower, debts, substitutions, and generally, all incumbrances or impediments whatever.

The deed, in most ample terms, conveys the land, in full title absolutely, for a named consideration, to Louis Labeaume, on the 2d July, 1808; and it was acknowledged and recorded on the same day. The condition of the title of this land after this deed was made, was this, so far as the records of the county showed it.

In 1772 a survey was made by Duralde for Kiercereau. On the 5th Dec., 1779, it was sold and conveyed by judicial authority to Delorier. On the 2d July, 1808, Delorier conveyed to Louis Labeaume, by his general warranty deed of that date. Thus on paper there was a regular and specific title from the government to Louis Labeaume, and this title Labeaume filed, and claimed thereon a title to himself.

An adverse title is pretended to Labeaume's, to an undivided half, defending on matters in pais. It is said that Delorier's wife was entitled to half, and that on her death, under the Spanish government, her two children succeeded to her right. This claim, however; never

was filed. No notice, showing its nature and extent, was ever presented according to the act of congress.

The other title (Labeaume's) was presented with a due and legal notice thereon, claiming, in terms, the whole, not the half of the land; and the action of the recorder was upon the claim as so presented.

5. Awarding to the authorities above and the construction of the acts of congress, this confirmation was a grant *de novo*, all rights and inefficient titles had been barred; and the title passed from the government unaffected thereby,by the act of congress confirming the report of the recorder. The report, coupled with the act of congress, is the grant; and to as certain the meaning of the grant, as to the description of the thing granted, and the persons to whom it is made, we have to look beyond the mere tabular statement of the recorder, which is a part of his report, to the books and documents referred to therein. For instance, provincial land book No. 2, page 34, is there referred to; and when we look at that page, we find Duralde's survey of the tract in question for Kircereau. So under the head of "notice to the recorder, by whom," is inserted Paul G. Kircereau's representations, and when we look for the notice itself, we find it given by Labeaume as Kircereau's representative.

6. This grant to the representatives of Kircereau was to such representatives as had filed the notice required by act of congress. Labeaume was such a representative, and the only one who had filed any notice or claim to the land. The recorder, from the very terms of the report, itself, was acting on a claim to those 3 by 40 arpents, which had been brought before him by the regular notice; for he says as much in his tabular statement, extracted from his report; that is, he asserts that a notice was given by somebody claiming to represent Kircereau; and we show that notice which was filed by Labeaume, claiming to be such representative; and this notice was on file with the recorder, and must have been the one alluded to in his report, as no other one answering the description ever was filed by any body We are obliged to refer to the recorder's office to ascertain what representative of Kircereau filed the notice and claim on which the recorder acted, and we find it to Labeaume.

It is to be observed, that the recorder's report merely states the quantity and location of the land, and that notice had been filed by Delorier's representatives, and then the entry is only "confirmed" without saying to whom.

7. By law, the grant was to Labeaume, as the representative of Kircereau, within the intent and true meaning of the act of congress. The general spirit of these acts is to the land to the person who claims in the manner prescribed by the act itself, and there is a forfeiture declared as to all claimants who do not present their claims.

The act of 13th June 1812, under which the recorder was acting, in section 7, declares, that claims and notices may be filed till December 1, 1813; "but that the rights of all such persons as shall neglect so doing within the time limited, shall, so far as they are derived from or founded on any act of congress, ever after be barred, and become void, and the evidence of these claims never after admitted, &c." The recorder had no right to act on claims except so brought before him ; and when he has acted on a claim, and there is a claimant by regular notice before him, coming within the description of the succinct terms, and in his report of the act of 1816 will vest the title in such claimant, and not in a person lying back and never presenting his claim.

The act itself of 29th April 1816 confirming the report of the recorder, indicates that the titles are to pass thereby to the claimants before the recorder. In the second section it enacts that the decision of the recorder when in favor of the claimant, shall be, and the same is hereby, confirmed." congress understood that there was a person claiming and by law (all the previous acts) there could be a claim made only in one way, that is, by filing the notice and title papers. In ratifying the recorder's report, therefore, they assume that he has acted on claims lawfully brought before him; that there is a claimant in such case, by notice, &c.; and they enact, that where he has decided in favor of such claimant, his report shall be confirmed and pass title. And pass title to whom? Certainly not to a person claiming orally, out of doors ; who stands back and never files his notice during seven years, and never makes the tribunal, authorized to act on such claims, ac-

quainted with the fact that he has a claim. There can be no such intendment. But if there be two claimants of the same land, and one of them has filed his claim under the act of congress, and the other has not, the intendment must be in construing these grants made by the act of 1816 confirming the recorder's report, in favor of that one who is within the scope of the act of congress in all their legislation on this subject. He will be considered the claimant who is to be benefitted by the confirmation.

The contrary construction would give the land to a class of claimants prohibited by the acts of congress from being benefitted thereby, viz: those who neglect filing their claims.

12 Miss. Rep. 238, Landis et al. vs. Perkins, p. 255, it is said—confirmation passed title to assignee of claim who filed his claim.

8. The claim under Mam. Delorier is entitled to no favor as having been owned by a married woman. 1st, Because the acts of congress make no exception as to infants, married women, &c. 2nd, Because the Spanish law was in force till after 1812, and a married woman was, by that act, considered as a *feme sole* as to her paraphernal property; and this right, whatever it was, being inherited by Mrs. Tison and Mrs. Dehotcre, was paraphernal, 4 'Teburo 471, No. 218; 4 Miss. R. 380.

9. Nor can it be successfully contended that the claim by Labeaume, who, complainants admit, was owner of the undivided half of the title, enure to the benefit of those who claim the other half under Mrs. Delorier. Labeaume's notice and title papers presented a claim, not for half but for the whole. He was claimant in due form for the whole, and the recorder in deciding upon it says "confirmed." What confirmed? Labeaume was confirmed in his claim. The title was made good to him. It does not mean that the land was confirmed to persons who had a Spanish claim to the land in whole or in part, and never had complied with the acts of Congress so far as to present their claim.

We are liable to be misled here with the impression that there is still existing some lien or right against the government, whereas there is nothing of the kind in 1812, for every thing of that sort had been cut off by the previous acts of congress, and failure to file claim under them. The land was to all intents public domain; as much so as if Duralde had never surveyed it. Congress, then, in the act of 1812, took up the subject anew and made provision for occupants and actual settlers; and section 7 of the act of 1812 authorized the recorder to confirm such claimants as pre sented their claims within a given time. Now it is proof here, that Labeaume did actually occupy a part of this three by forty arpents by enclosure and cultivation. He was the owner of a tract of land conceded to him, and which interfered with the three by forty arpents got from Delorier; and this portion of the interference was actually occupied and cultivated by him as a part of the farm where he resided, and there was no proof whatever, that Delorier, or his wife. or her children, ever occupied, or cultivated any portion of the tract.

This class of confirmations, or grants, as they may more properly be called, was for the benefit of actual settlers, and the recorder, in this case, having described him as the representative of Kircereau, who filed notice of his claim, and Labeaume coming within the description, both as rep. senting Kircereau, and as settled on the land, and also, as having filed the claim, how can it be said with color of reason, that other representatives of Kircereau, not actual settlers, and not filing claim, are to be confirmed as to half of the tract? They were not actual settlers on half, or on any of the tract.

Even were it not proved, (as it is in this case) that Labeaume was actually settled on this land, as a part of his plantation or farm where he resided, yet, this would be presumed at this day. The notice was evidently filed under the act of 1812, which was confirmed to actual settlers; and the recorder took cognizance of it and decided in favor of the claim. It is to be supposed now, that all was proved that was requisite.

10. The confirmation by the recorder is the only confirmation or grant by the U. S., of which there is any evidence; and it passed the title of the land in question. The evidence of this, first, because both parties, complamants and defendants agree that such is the fact. The complainants gave in evidence the same confirmation, having abandoned certain confirmations

of the old board alleged, by mistake, to comprehend the land in question; and the defendants likewise gave in evidence, and relied on the same confirmation by the recorder. 2nd, because there is no proof, or evidence tending to prove that the tract of three by forty arpents in question was inhabited, cultivated or possessed prior to 1803. The minutes of the recorder are no evidence, in this suit, of that fact. He was not authorized to perpetuate testimony, nor to keep a record of the testimony he took, nor to confirm claims or take cognizance of them on the ground of inhabitation or cultivation previous to 1803  If he took such testimony it was irrelevant and unauthorized; and it was not known whether it was all that he took or heard in the case. There may have been counter testimony, not presented to him. Nor does his statement of the possession prior to 1803, establish the fact of possession. He had no authority to certify that fact; and, of course, his statement of it is no more evidence of it, than the certificate of any other person, and if it were a fact—if such possession had been of the land, then the recorder had no jurisdiction of it, or would have been already confirmed by the act of 1812. His recital of a fact, which if it had existed, would have nullified his jurisdiction, cannot be proof of that fact, as between parties both claiming under the exercise of his jurisdiction in the particular case.

8 Miss. R., 65, Hammond vs. Public Schools. This case was similar to the present one; and the court held that the recorder's Rep , confirmed by act of 1816, passed the title; and the statement of the recorder that there had been possession prior to 1803, was not considered as proving or tending to prove that fact, so as to work a confirmation under the act of 1812.

The tabular report of the recorder in Laqussie's claim, under which Hammond claimed, was like the one in the present case and stated possession prior to 1803.

11. The recorder might have decided in favor of claimants by name. He might in this case have said, "confirmed to Louis Labeaume," but he adopted a different mode, whether wisely or unwisely, it is now too late to consider. He adopted the mode of confirming to, or rather, of dividing in favor of the claimants; describing them not by name, but as assigns, or representatives of the original grantee or concedee of the Spanish government. It will be found on examination of his report, that this was his course. He could not have meant the heirs, as the only representatives in all such cases. His words must be interpreted and limited so far as to effectuate and carry out the intentions of congress. That intent was to give the title to such representatives of the concedee, whether by devise, descent or conveyance, as had complied with the acts of congress, and put of record his claim, by filing his notice and title papers. I do not say that the heirs are not one class of representatives, and if the confirmation had been made without any notice or claim filed, that they would not have received the title under the description of the representatives in the absence of assigns of the land; but I do say, that when a representative by a regular chain of conveyances from the original concedee, has duly filed his claim and brought himself within the acts of congress, the confirmation, in the absence of all claim filed by any other representative, will enure to him as the one described and intended in the recorder's report, and meant to be benefited by the act of congress.

The representatives of Kircereau by blood is not what was intentended; it is his representatives as to the land, who manifested themselves as such, in the prescribed mode, upon the land records of the country, which is meant by the acts of congress, and by the recorder in carrying them into effect.

12. The word "representatives" is a general term, and is applied in the language of legislation and courts to embrace different persons, according to the subject under consideration. Ordinarily, the representatives of a deceased person, to personal property, is the executor or administrator; as to land, it would be the heir. It is so, because the law declares, that upon the death of a person, his property shall pass to those who stand in that relation to them respectively. Now here, the law (which is the several acts of congress on the subject) has pointed out who shall be the representatives of the original concedee as to the land conceded, to-wit: such heir, or such assignee or devisee as prefers his claim by complying with the

Tison vs. Labeaume.

act of congress, and who qualifies himself to receive the final title by filing his notice and claim. The latitudinal meaning of the word "rep.," is sufficiently apparent from the acts of congress of 2nd March, 1805, section 1 and 4. The first section provides that the concedee or his "legal representatives," shall be confirmed; and the 4 and 5 sections show that those "representatives" are the assigns, &c., who came forward and filed their claims also see acts of 3d March, 1807, sections 2 and 5.

13. We are not bound to show that the whole titles, or indeed any title of Kircereau, to the land was vested in Labeaume in order to make him his "representative," for the purpose of obtaining the benefit of this confirmation. We are to show, at most, only a chain of title from Kircereau *on paper*, such as would have been translation of title, *prima facia.* On the production of these documents, he stands before the recorder as the representative of Kircereau, or to the land in question, and in the absence of all other claimants appearing with their notices and evidences of their being representatives, Labeaume must inevitably be considered as the only representative of Kircereau. Mesne conveyances from Kircereau, on their face purporting to convey and capable of conveying the land in question down to Labeaume, is all that is necessary to constitute Labeaume the representative of Kercereau, as contemplated by the law, in order to receive the title by the confirmation.

14. The fact, if such be the fact, that the word "reps." in the report of the recorder, is in the plural, cannot affect the argument The recorder's report is in tabular form, consisting of several columns, each headed with a caption explanatory of the entries therein. Under the head of "notice given by whom" is entered "P. G. Kircereau's reps." This may have been intended either for "representative" or "representatives," and with equal propriety. But even were it undoubtedly in the plural, it could not, merely by that error, overthrow the intent of congress, and operate a rejection of the claim filed by Labeaume.

It will be seen that the recorder uses the plural (if the above contraction is the plural) in all cases in his report, and probably it was so done as comprehending *all*, if there were more than one, and certainly comprehending one, if there were only one.

15. Upon the face of the deeds the title was in Delorier to the whole tract. His wife's interest in it, the conveyance having been made to him alone, and there being no marriage contract, was not in the nature of a title to the land. She had not any title or estate in it, but the whole title was in Delorier, the husband, and his deed alone would have passed the title in his wife's lifetime, divested of all claim on her part.

5 Mast. Rep. (N. S.) 54 Sprigg vs. Boissin and wife, at p. 55, Parker, Judge, says that the land being deeded to the husband, he could sell, exchange or give it away without the wife's consent; whereas, if the deed had been to both, she would have had half in her own right.

2 Zebren, page 253, note 61, that when the husband conveys or mortgages his property, "it is useful to have the wife join to relinquish her privilege and right against his property for dowry," &c. This shows that she is not required to join for any other purpose.

3 Febuno, 164, note 26, (lib. 1 ch. 4, note 26 of 2nd part) that the husband during marriage has full dominion over his property and can administer, sell and convey at pleasure all the gains ("gananciales") if he is not acting with intent to defraud his wife.

3 Teburo, 103, note 45, to same effect, repeating same.

Lib. X, tit. 4, law 5 (3 vol. Recompilation 426) to the same effect.

8 Teburo, 151, (lib. 1, ch. 4, sec. 1, no. 1) gives the meaning of "gananciales" acquisitions during marriage.

3. Teburo 173, nos. 46, 47 and 48, treat of the question whether the power of the husband to alienate the gains, comprehends the power to lose in gambling or to give away; showing that there are discordant opinions.

These references show that the deed to Delorier placed the title in him; and his deed to Labeaume, being in due form, and purporting to convey the whole land with full and absolute title, he, Labeaume, ought to have been and was regarded as the representative of Kircereau, in regard to the land, as to the full and entire title.

16. If there are several sets or classes of representatives, and one class proceeds under the

Tison vs. Labeaume.

acts of congress, aud filed their notice and title deeds, and the other class fails to do so, a confirmation in general terms under the acts of congress to the representatives will vest the title in those who filed their claim and placed themselves in a position to be benefitted by the provisions of the law.   Otherwise, the acts of congress will be defeated, which provides that the claimant who fails to file his claim shall receive no benefit under the acts, and never shall set up his title deeds against any grant from the government.   In such case it was the duty of the recorder to report in favor of the claimant; that is, in favor of the person or persons presenting their claim, which on its face shewed that they were assigns of the land; and he would have done his duty to the letter had he reported a confirmation to the claimant by name. Had he done so, there could be no question but that the title would have vested in such claimants.   In the present case, had he reported in favor of Labeaume by name, and said, "confirmed to Louis Labeaume" in his report, there could have been no controversy.   Why shall the omission of the recorder to mention the name of the claimant, when he is fully described in the report connected with his notice, and documents filed and recorded and acted on by the recorder?

17.  This is not the case of one joint owner or co-heir presenting claim, and on the very face of his claim, or deed, or devise to him, filed with his claim, it appears that he is only one of several joint owners of the claim.   In that case the question before the recorder would be whether to confirm to all of them, or only to the one filing his claim, his portion ; as the claim on its face would show that the actual claimant was assignee and owner of only a part of the land.   The present is not such a case.   The claimant on the face of his claim as presented, is assignee and apparent owner of the whole land, and in his notice claims the whole land.   The recorder did not have to consider whether he would confirm to the claimant what he claimed on the face of his papers, and also whether he would confirm the residue to the other joint owners or assigns; thus considering one part owner as authorized to present the claim of, and act for all.   Labeaume did not show any title papers indicating that others had an interest, or that he owned only an individual part of the land ; nor did he say that in his notice, on the contrary, notice, documents, and all, claimed the whole land and showed him to be assignee of the whole, and the recorder decided in his favor, and confirmed the land to him under the description substantially of the "repr." of Kircereau, who filed notice of the claim; and that no other representative can be embraced in the confirmation is fairly inferable from the tenor and scope of all the acts of congress on the subject of those Spanish claims, and from the annulment by them of all the rights of those who fail to present their claims and record their deeds.

18.  The acts of congress indicate that several motives of policy operated to cause their passage. One, and a main one, evidently was, the preserving the muniments of title, by a record of all conveyances, so that the country, which had just been acquired from a foreign government, should start under its new possessors with a full knowledge of the state of titles, and who were proprietors of lands, and with that security as to real estate which is necessary for the repose and prosperity of every community.

The act of 2nd March 1805, section 4, inflicts a severe penalty on all owners of inchoate titles who shall " neglect to cause to be recorded their written evidence of claim comprehending mesne conveyances ; nothing less than forfeiture of their rights, and perpetual inability to show such recorded deeds in evidence.   Why this, if one important object was not to preserve the land titles of the country, and make them certain, as a part of the municipal law and policy of the newly ceded territory?   This record was not necessary to the decision of the commissioners; for they could have acted on the claims and returned the papers without recording them.

19.  It was said on the hearing below, that the recorder did not act on Labeaume's claim in this case.   That he did, is apparent for these reasons—First, he acted on a claim, made by filing notice before him; and we give in evidence the notice of Labeaume, and no other notice by any person is produced.   The report itself shows that there was a notice.   Second, The notice was given by somebody claiming as representative of Kircereau—that is representing all of Kircereau's right.

## Tison vs. Labeaume.

As the report also indicates, Labeaume filed such a notice, and no other person. Third. After this notice and accompanying papers were filed, the recorder is found taking evidence respecting the land under the name of Paul G. Kircereau, and marks it in his minutes "confirmed." Fourth. The intendment of law is, that as the notice of filing of papers were necessary to give jurisdiction to the recorder, and he had no power whatever to take jurisdiction and act on the claim without the filing such notice and papers, that as he did act and take possession of the claim, that such action must have been under the notice of Labeaume or that there was no other. He cannot be supposed to have violated his duty, and having jurisdiction of the claim by the filing of the notice, to have thrown it aside and acted independantly of it, and upon the oral claim of some other claimant. When he acts upon the claim it is under the name of Paul G. Kircereau, and in the very entry he states that there are claimants under him; and the documents filed show that he had been dead thirty or forty years. Here then is a notice, or declaration as it might be styled, filed with accompanying documents, minutely describing the claims and the land, and the claimant claimed it under Kircereau. Then follows in the minutes of the recorder, and entry of his action, as to the same land, but entered under the name of Kircereau, and stating that it was claimed under him, but the name of the claimant was not entered. Then follows the report of the recorder, stating the quantity, situation and original concedee of the land, and that a notice had been filed by somebody representing the original concedee, Kircereau, and that the land was confirmed. How can there remain any doubt, but that the recorder was acting upon the claim as filed by Labeame? And even if we know that the recorder never thought of Labeaume or his claim, yet how can a court avoid holding that he must, by intendment of law, be held to have acted on Labeaume's claim, and that the confirmation, therefore, enures to him.

20. If the entry of the recorder, of possession prior to 1803, is to be considered evidence of that fact, then all his confirmations of lots and out lots are void ; as they showed on their face a fact that divested the recorder of jurisdiction, and what is more; showed that the same land had been previously confirmed by the act of 1812. In this case, then, the land in question was confirmed by the last mentioned act, on possession. And whose possession was it? Of Delorier's—then the confirmation was to him or his representatives, and his representative was Labeaume. The act of 1812 was a legislative grant, outright, of land on which there was no legal lien or claim, unless it had been filed according to the acquirements of the acts of Congress. But if the possession was Kircereau's, then the confirmation was to Kircereau's representatives; and his representative, through Delorier, was Louis Labeaume.

II. But waiving the question as to the operation of the confirmation, the appellees maintain in the second place, that there has been proved, no fraud, oppression or advantage taken of the ignorance or inebriety of Mrs. Tison and Mrs. Dehetere, or any misrepresentations whereby the deed to Louis Labeaume can be avoided.

1. A mistake in law will not vitiate a contract. 1 Story's Equity, secs. 110, 11, 12, 13 ; 2 East 469—ignorance of law no excuse ; 12 East 38—to the same effect, 1 Pet. 1. A mistake of law no ground in equity for reforming deed; 6 J. C. R. 169 ; to similar purport, reviewing many English cases. Story lays it down as generally held that mistakes of law cannot avoid a contract. In vol. 1, sec. 116, he says, that "whatever exceptions there may be to this rule, they are not only a few in number, but they will be found to have something peculiar in their character, and to involve other elements of decisor: in other words, that this mistake of law above is not sufficient.

The case of Pusey vs. Desbouvrie, 3 Pr. Williams, 315, is cited as a case of exception; but here was a right to place confirmed in the brother, and he gave false information, and there was a total ignorance of rights, and an opportunity to obtain knowledge. She acted under misplaced confidence. 2 Bro. Cly. Rep. 150, S. C.; 1 Cox, 333, Evans v. Llewellyn. In this case there was proof of fraud and imposition. They treated the man to liquor, &c., and made the bargain, and carried it into effect on the spot. The court say that he ought not to have been relieved if he had gone home and consulted his friends before completing the bargain.

Story, in one vol., from sec. 120 to 137, considers the cases that have been supposed exceptions to the general rule, and in sec. 137, says as follows.—"That the real exceptions to the general rule are few, and generally stand upon some very urgent pressure of circumstances." "In England, the rule prevails (that mistake of law does not vitiate) in all cases of compromises of doubtful, and, perhaps, in all cases of doubted rights, and expressly in all cases of family arrangements. It is relaxed, in cases where there is a total ignorance of title, founded in the mistake of a plain and settled principle of law, and in all cases of imposition, misrepresentation, undue influence, misplaced confidence and surprise. And hitherto the exceptions to it, if any, will be found not to rest upon the mere foundation of naked mistake of law, however plain and settled the principle may be, nor upon mere ignorance of title founded upon such mistake." (See the note also to this action.)

Where there is a mixture of mistake of title, gross personal ignorance, liability to imposition, habitual intoxication and want of advice, equity has manifested a disposition to interfere. 1 Story, sec. 133.

2. MISTAKE OF PARTY. As to mistake of party, it is held that an act done or contract made, in ignorance or by mistake of facts, material to the act or contract, or essential to its character, and which the party could not, by reasonable diligence, get knowledge of, if put on enquiry; and if the other party has known and taken an *unconscience* advantage by concealment of them, it being a case where one was bound to communicate to the other, in such cases the court would give relief. 1 Story's Eq., sec. 140, as to general doctrine. Ibid, sec. 141, that the facts must be material. Ib. sec. 146, that the facts must be such as the party could not reasonably have known. Ib. sec. 147, that if parties act fairly, and if it be not a case where one is bound to communicate to the other the facts on the ground of confidence, there the court will not interfere. Ibid, sec. 148—and there must not only have been an obligation in point of morals, that one party should disclose the facts to the other, but there must have existed a legal duty. There must have been fraud or surprise, confidence reposed, or party intentionally misled.

3. COVENANT. Ib. sec. 149, 150, 151—laying down the doctrine on this subject, and the conclusion is, that "where each party is equally innocent, and there is no concealment of facts, which the other party has a right to know, and no surprise or imposition, the mistake or ignorance whether mutual or unintentional, is treated as laying no foundation for equitable interference."

"If A, knowing of a mine in B.'s land, of which he knows B. is ignorant, buys the land without disclosing the fact, for a price in which the mine is not taken into consideration, B would not be entitled to relief." 1 Story, sec. 147.

2 Wheat. 178, as to a similar principle, as applied to mercantile transactions. 2 Bro. Chy. Rep. 420, Fox v. Macreath: A person who purchases land is not bound to disclose to the vendor the fact that there is a mine on his land.

1 Story's Eq. sec. 205, 206, 207. The result of authorities is, that under concealment, for which there can be relief, is when the "party is under some legal or equitable obligation to communicate the facts; and, which the other party has a right, not merely in *conscience*, but *in law*, to know."

1 Story Eq. sects. 212, 213, 214, 215, 216, 217, 218: As to concealment, or *suppressio veri*, that in such cases the court will not relieve, "unless the very silence of the party must import as much as a direct affirmation."

4. MISREPRESENTATION. Misrepresentation to vitiate, must be not only in something material, but in something, in regard to which the one party places a known trust and confidence in the other. 1 Story Eq. sects. 197, 199.

5. SURPRISE. Surprise, to be the foundation of relief, must be accompanied by fraud and circumvention, or by circumstances showing that the party had no opportunity to use suitable deliberation. 1 Story Eq. sec. 251; 3 Chy. Cases, 56, Earl of Bath & Montague case. In this latter case, several of the judges define surprise.

6. INADEQUACY. Inadequacy is, by itself, no ground of relief. Mere inadequacy, untinc-

Tison vs. Labeaume.

tured by fraud or circumvention will not justify the vacating of a contract. 1 Story's Eq. 244, 245; 2 Har. & Gill, 114; 2 Bay 300; 5 Ham. 471; 3 Call. 433; 1 J. C. R. 1; 5 Ohio 468.

7. UNDUE INFLUENCE. Undue influence must be of such a nature as that the party has scarcely the ability to act as a *free agent*, and cannot protect himself.

1 Story's Eq. sec. 239: The threats, undue influence, &c., must so intimidate as to be a sort of duress to an ordinary person.

8 LAW—doubtful and doubted in this case. In the present case the law was *doubtful* and *doubted*. In Louisiana it was litigated and unsettled till a late day, whether the husband had power after his wife's death, to convey the whole title in the lands belonging to the community. 7 Louis. Rep. 216.

When this deed was made in 1836, it was held in Missouri that prescription continued in force, at least to December 1818; and the circuit judges had decided that it continued till 1825.

Prescription ran against married women, as to *paraphernal* rights. 4 Teburo 471, No. 218; 4 Miss. R. 380; 2 Tebu. 129, No. 8, as to what is paraphernal.

By the Spanish law, civil possession was sufficient for prescription. 6 Louis. Rep. 226; 2 Spanish Partictas, 461, law 29, title 29 and note; 12 Peters, 456.

1 vol. Morean's Partidas, 394-5-6-7-8 and 400-1-2, &c.—showing that civil possession is acquired by a conveyance of land, if there be no adverse possession.

In the present case, Labeaume had actual possession of a part under a deed for the whole.

It was also doubtful, to say the least, who was the confirmee of the land, the probability being in favor of Labeaume, as above under the first point is shown.

And it appears in evidence, that a lawyer advised one of the witnesses as to the title, who informed Labeaume, the principal defendant, that the right of those women (Mrs. Debetre and Mrs. Tison) was worth next to nothing, putting it on the footing that if a trifle would get their deed it was advisable to get it ; that they had no right but a show or pretence, that might possibly give rise to a suit, and therefore had better be removed.

Many cases have been cited by the complainants below to establish the general doctrines to which the present is compared, and it is said to fall within their principle. Some of these are subjoined.

4 Dessaus, 690, Buller vs. Hasbell. This seemed to have been more relied on than perhaps any other case. But it was a case that turned on the relation of the parties, one being agent of the others, and having got a good bargain from them, p. 702. The chancellor also decided the case differently in the court below, p. 673. And the doctrines of the case have been called in question. 1 McCord, 390.

Ca. Temp. Talbot, 111, Proof vs. Hives, cited by the court in 4 Dessansvil. In this case the plaintiff was so poor that he lived on broken meat got from taverns and such places. Advantage was taken of him by persons employed to get his estate, and the court said it could not relieve unless there had been imposition. 14 Vesey, 214, Picket vs. Loggon, said in 4 Dessauss. to be one of the most important ever decided, was of a gross fraud, squalid poverty and distress, and fed by charity. See page 242.

14 Vesey, 91, Purcell vs. McNamara, was a case of undue influence from the relation of the parties.

Many of the cases cited were of heirs selling their expectancy. Those cases are in England *surlgevences*, and turn on different principles, as 1 Brown, n. 1, Gwynne vs. Heaton. This was a sale of expectancy by the heir. A. p. 9, the court says, "that there is a policy in justice protecting the person who has the expectancy, and reducing him to the situation of an infant, against the effects of his own conduct. The principle has been settled, and the rule laid down in 3 P. Williams, 290, and the court has proceeded upon it for near a century. The heir dealing for an expectancy shall be distinguished from ordinary cases."

So in 1 Atkins, 347, Earl of Chesterfield vs. Janson, "Contracts of post obit nature are in

general not to be countenanced." And at page 352, that such are deceits on the ancestor or father, the same being kept from disclosing, &c.

A great portion of the cases in 4 Dessaussure, cited by the court, are of sales of expectancies.

13 Peters, 26, Smith vs. Richards, cited to show (by complainants) that suppressio veri, or suggestio falsi, is fraud. But the case shows the most glaring misrepresentations as to the character and value of the gold mine, pages 35, 36; and at pages 36, 37, that the misrepresentation must be as to something material, in regard to which, one party places a known confidence in the other. At page 38, the misrepresentation must be not merely expressions of opinion. See page 29. Even in this case, Story, McLean and Baldwin dissented.

1 Brown, 558, Galside vs. Ishawood. This was a case where the party was of very weak mind, though proved not to be a fool. See pages 561, 562, and the bargain was obtained from him by persons standing in such relations to him as to be trusted by him, and was his agent, and the other was a person peculiarly confided in.

Many of the cases also cited by the complainants below, were of specific performance, as were many of the cases cited in the elaborate case of 4 Dessaussure. Such was the case of 3 Cowen, 445, and others.

Courts of equity will repose specific performances, for reasons which would by no means induce the courts to act in granting relief, or setting aside a contract

2 Story Eq. 47, sec. 742. That specific performance is not matter of right; that courts withhold or grant relief according to the circumstances of each case; and sec. 750-1, that it will not be granted in many cases of legally binding contracts, leaving the parties to their legal remedies; and sec. 769, "that it requires a much less strength of case to resist a bill to perform than to enforce a specific performance, &c.;" and sects. 770, 771, that to entitle to a specific performance, a party must have been in no default; and the contract under the circumstances must be just &c."

Those cases, therefore, of specific performance ought not to be cited in the present case, inasmuch as the object and reasoning of courts, in their decisions in such cases, are not applicable. Those cases turn on different principles.

III. This is a State claim, and such a one as, under the circumstances, a court of equity will not enforce, even if otherwise it had merits.

1. The right of complainants accrued under the Spanish government, for the mother then died.

2. These two women were as femmes soles as to this right, it being inherited, and therefore paraphernal.

3. There was nothing to prevent their enforcing it down to the 17th December, 1818, when prescription was repealed; and no good reason is assigned why they did not do it.

4. From July, 1808, the date of Delorie's deed, to December, 1818, is more than 10 years of adverse possession by Labeaume, a decree of laches in complainants which, under Spanish law, would have operated as a forfeiture of title.

5. Here is a lapse of some 50 years almost, during a considerable portion of which time, complainants were under no disability, as that of marriage, under Spanish law, was none as to paraphernal rights.

The acts of limitations, laches, and inconvenience, public or private, prevent relief in equity. Lewin on Trusts, 622, (22 Law Libr.) also 612-13, and C. 617; 2 Ch. Rep. 44; 4 Vesey, 627; 2 ib. Ir. 87, 582; 2 V, 418; 1 R. M. 453.

SUMMARY.—There was no actual fraud. The bill charges it, but it is denied in the answer, and not proved. The whole course of Labeaume refutes it.

They were not ignorant as to what claim they were selling, nor as to what land. The bill charges that they were, and the answer is responsive and denies, and the proofs do not establish it.

They were not weak-minded and ignorant, so that the court would exercise a sort of guardianship over them to protect them.

There was no relation between them and Labeaume, whereby he would be or was particularly confided in. He was not their relative, or trustee, or agent, &c.

They were not surprised into the sale of deed to Susan Labeaume. Three weeks intervened between his application and purchase, and their coming to town to close the affair and acknowledge the deed in court, and they were in town several days on that occasion, and were well acquainted here, and had friends among the most wealthy and intelligent, and ample time and opportunity to consult, and they did undoubtedly consult. Their husbands acted with them. They made the bargain freely and deliberately, under no undue influence, with their eyes open, and knowing as much about their claim or pretence as Labeaume did.

In this country the doctrine is, that all are free to act as they please in making contracts, and not as the tendency has been under other governments, to consider them under a sort of tutilage, and subject to the supervision and control of the tribunals, as a sort of infants or semi-lunatics.

A contrary doctrine would be inconvenient and even dangerous in the United States, and especially here, where property is perpetually changing hands, and subject to such immense and sudden mutations in value ; and policy requires the utmost freedom and latitude in the transfer of all kinds of property and rights. All that the courts should be permitted to do, is to enquire whether the parties are free from disability and in their right mind, and without fraud, have deliberately entered into the contract. They have nothing to do with the wisdom or hardness of it.

The claim or pretence of the two women, was at the time a mere shadow, not a title. As the law was then understood, it was nothing more than it was represented to be, an apparent cloud on the title, for which a prudent man would have been willing to pay a trifle to save the cost of a law suit.

The bill has originated in the enterprise of speculators, who have made a champertous bargain with the nominal complainants, and are conducting the suit at their own expense and for their own benefit. This appears in the proofs and in the record.

But whether there be misrepresentation or surprise or not, it is of no consequence, as by the confirmation the title vested in Labeaume, and therefore the complainants had no interest whatever in the land. That they gave a deed of what they did not own and had no claim to, through deception or surprise, is no ground of equity. There must be injury as well as fraud or malpractice, to set a court of equity in motion.

BIRCH, J., delivered the opinion of the court.

It appears from the record in this case, that in the year 1779, Francis Delorier became the owner, by purchase at judicial sale, of the claim of Paul G. Kircerean, to a tract of land three by forty arpents, lying in what is now the St. Louis or Big Mound Prairie, and which is the land in controversy in this suit. Delorier was at that time a married man, having a wife and two children. His wife died in 1802, and the right of her children, one of them in person, and the other through a proper representative, are set up in this suit under the Spanish law which prevailed at the time the land was transfered by their father. This was in 1808, at which time Delorier (their ancestor) sold and conveyed it by deed of general warranty to Louis Labeaume, (the de-

fendant's ancestor,) who alone made proper claim to it as assignee, and whose application resulted in a confirmation by the recorder, and a subsequent ratification by congress, in the name of Paul G. Kircerean's representatives. On the part of the children of Mrs. Delorier, (complainants here,) no claim of any kind was ever put forth to the land, either before the recorder or elsewhere, until a short time before the commencement of this suit, which was two or three years ago; and this notwithstanding the husband of one of them was married to her at the time, and lived with her for between thirty and forty years after he attested the deed of their ancestor to the ancestor of the present defendants. In addition to this, all the principal parties reside, and have resided for fifty years and upwards—the complainants in the country, and the defendants in the city of St. Louis.

In the year 1836, after the land had become very valuable, in consequence of the extension of the city over a portion of it, Louis A. Labeaume, one of the sons, and the agent of Mrs. Susan Labeaume, to whom the property had passed by the will of her deceased husband, procured a deed from Mrs. Tison and Dehetre, and their husbands, under circumstances which, if not unfair and inequitable, will of course render it unnecessary to particularly examine and decide the other and heavier questions which have been raised and relied upon by their counsel here.

In the former respect, the bill charges that Mrs. Tison and Dehetre, although children and heirs of Mrs. Delorier, knew nothing whatever of their ever having had any interest in the land in controversy, or of having conveyed it to any one, until within about six months preceding the commencement of this suit, they were advised by counsel in regard to their title, and informed, likewise, that a deed to Susan Labeaume, made by them and their husband on the 10th day of October, 1836, was on record in the county of St. Louis. It is charged that several years ago, a son Mrs. Labeaume, named Alexander (Louis A.,) visited Florisant and represented to the said Mrs. Tison and Dehetre, that their father, a long time ago, had owned a little piece of land near the big mound, at St. Louis, which he had sold to his father, (Louis A. Labeaume,) and shewed them the deed of their father, saying it was witnessed by the husband of one of them; that his father was dead and he was attending to the business of the estate, and had come to get their signatures, for which he would pay them; that he wanted them to sign, because the deed to his father was defective or informal, and as there was but two of them, (meaning Mrs. Tison and Mrs. Dehetre,) he wanted their signatures to perfect their father's deed, and save him

Tison vs. Labeaume.

from doing it by law; that he did not wish to sue them—represented, the matter as of no interest to their husbands, they having no concern in the matter, their signatures being necessary as mere form, and that if they would sign for him, it would save him some trouble, and he would pay them for it. The bill further charged that the matter was then referred to said Alexander, who was confided in by the said old women, and who took a deed from his pocket which he read to them, and which they agreed to sign, and did sign, under the impression that it was to perfect their father's deed, without any intimation from said Alexander, or any suspicion on their part, that they were conveying away any interest or right of their own. It is further charged that the said deed, as is now understood, was in the English language, which was neither spoken nor understood by said old women, who could only speak the French language, and who could neither read nor write; that they were very ignorant, very old and very poor, and placed entire confidence in all that was said by said Alexander, who told them he was educated in Paris, and all of whose conversation with them was in the French language; that after a long conversation with them, he agreed to give them each fifty dollars for their signatures, which they agreed to take, and they and their husbands signed accordingly—although the latter got nothing. The bill further alleges that no money was paid to them on the day they made the deed, which they acknowledged before a magistrate, brought to them by said Alexander, who told them he would not pay them the money until they came to St. Louis, as they thought to sign over again, provided they did not before that time sign for any one else, and when they came to town to come directly to him, and he would pay them; that accordingly, at the time appointed they went to St. Louis, proceeded directly to said Alexander, who took them straight to the court house, where they thought they did sign, but, as they now understand, they but acknowledged the execution of the said deed, upon which he paid them, as they supposed, fifty dollars each. The bill complains that the women were not informed by said Alexander of the amount of land they were conveying, or that they were owners of one half of it, or that they were conveying any thing belonging to them in any way, and that he did not state the value of the land, or the difficulty which really existed about the title, or they never would have signed the deed for fifty dollars each. It is further charged that said Alexander had been advised in the matter by counsel learned in the law, that he was himself intelligent and knew all about it, but did not inform them in regard to their right, but by fraud and misrepresentation, and for vast inadequacy of consideration obtained the deed, in

question, and the prayer of the bill is, so far as it is material here to consider it, that the said deed be so far set aside as to decree to complainants one half the land not previously sold by defendants to innocent purchasers, together with an equivalent in the remaining half, or in money, for the half of such quantity as had been thus previously sold, and for rents, profits, and general appropriate relief.

The answer of Louis A. (Alexander) Labeaume, so far as it is deemed responsive to the bill in this respect, (and partaking, therefore, of the nature of evidence, which it may be as appropriately remarked here as elsewhere, has been in no respect legally overthrown), denies that he or his mother ever heard of any defect of title to said land until 1836, when after the public sale of lots in his mother's addition to St. Louis, which covered a portion of the land in contest, one of the purchasers suggested to him, that Josiah Spalding, Esq., of St. Louis, an attorney at law, had informed him that there perhaps was, or possibly might be, an imperfection in the title, as it was delivered to Mrs. La beaume through her husband, from Delorier, and Delorier's wife, if he had one, had not signed the deed to said husband, Louis Labeaume. That thereupon, (being his mother's agent in all matters of business), he asked said Spalding about it, who told him, in May or June, 1836, that if he could get a relinquishment from the heirs of Delorier's wife, if there were any, for a trifle, he had better do so, as it might prevent trouble or save a law suit; that the title was not represented to be bad in his mother, or that Delorier's heirs had any title or interest, but that such a deed was desirable to remove objections and the chance of a law suit. The respondent alleges that he did not then, nor does he yet think, that the heirs of Delorier's wife had any title, and states that although he knew where they lived, he thought so little of their claim, or pretence, that he took no steps to procure their conveyance, until the 10th of October, 1836, when he drew up the form of a deed in the English language, at St. Louis, for their color of right or claim, and on the 17th of October went to Florisant to see them. He told them and their husbands what he came for—described to them the land and its situation—stated that Francis Delorier (their father) had sold it to his father, and that he wanted to get their deeds as to any right or claim which they might have derived from their mother, in order to perfect the title and prevent any future litigation; and that thereupon, after John B. Tison, the husband of one of them, who had witnessed the original deed in 1808, had started up and stated that he knew all about it, and remembered well that Delorier (their father) had sold the land to Louis Labeaume a long time previously, the respondent continued and held with

Tison vs. Labeaume.

them all a long conversation in French, explained to them particularly he deed he had drawn, correctly translating it into French, and drawing their attention to it, and to the title derived from them, as therein stated and set forth, which was all he knew about it. He did not tell them they had any interest in said land, for he did not think they had, and probably told them that he estimated their claim as of little value; that he did not say their husbands had no interest in it, but one of their husbands did; that he did not expect to give them as much as fifty dollars each, for he did not expect they would ask so much, nor did they at first, but they did demand that sum at last, upon the plea that they were very poor, and he consented to give it, more as charity than for any thing he conceived he was purchasing of them, for he did not consider their claim worth any thing.

That after they had agreed to execute the deed for fifty dollars each, he went for and procured a magistrate who took their acknowledgment, and, not having taken enough money with him, (for the reason stated,) he gave them his note, which he told them he would pay when they came into the city to acknowledge the deed, which he stated to them was not binding upon them until acknowledged in open court. That on the 9th of November, (being about three weeks afterwards) they called upon him in the city ; that he went with them to the court house, and, after they acknowledged the deed, paid them fifty dollars each, as previously agreed upon. He did not threaten them with a law suit, nor did he tell them the value of the land, but had they desired to know it, he would have told them. That not being their adviser, he did not advise them to consult counsel or friends, yet he withheld no information from them that he deemed it important to communicate, in order that their minds might be properly made up respecting the propriety of executing the deed he had prepared. He admits the location of the property as charged in the bill, and that it was worth, in 1836, ten or twelve thousand dollars, to which it may be added that some of the witnesses estimated it much higher. He states that he consulted no one as to the title—deeming it to be substantially good in his mother—and that he acted solely on the prudential advice of Spalding, as already stated. He denies all fraud and confederacy, as charged in the bill, and expressly denies that the parties to the deed he obtained, were either weak minded, ignorant or imbecile as alleged by the complainants, and states, moreover, that they had the most ample opportunity to consult intelligent and respectable friends in the city, in reference to the propriety of consummating the contract into which they had thus partially entered whilst at home in the country.

17

The deed of 1836, which is made an exhibit, sets out the location and quantity of the land, recites the derivation of their father, Delorier, from Kircereau, its sale by their said father to Labeaume, (the ancestor of the defendants) refers to the previous grant and deeds, and for the consideration of a hundred dollars, transfer all their right, title and claim (without warranty, except as to themselves, &c.) to Mrs. Labeaume, the mother of the principal present defendants, and who (it will be remembered) was also, whilst living, the devisee of their father's title.

The testimony of Music, the magistrate before whom the original acknowledgment was taken, is to the effect that after he had read the deed to all the parties in English, Labeaume translated it into French for the benefit of the women. The witness himself had some understanding of the French language, and both the husbands, (Frenchmen) who were present and signed the deed, not only understood both languages, but one of them was the neighborhood interpreter, or translator. It is therefore not only uncharitable, but absolutely unreasonable, to suppose that Labeaume in any respect attempted to impose upon them concerning the tenor and effect of the deed they were about to execute, and did then and there execute. The substance of the testimony respecting their subsequent acknowledgment of it in open court, is that it was taken by the presiding justice, (Leduc also a Frenchman) who conducted the examination and made the enquiries in their own language—that having been the custom of the court when such business was to be transacted with French ladies. The certificate of Mr. Chouteau, the clerk, (a French gentlemen also) is in the usual form as to their "having been made acquainted with the contents" of the conveyance, and is in no respect, either legally or morally, impeached or impugned. It has been already stated that about three weeks intervened between the period of the first and second acknowledgment of the deed—the last one having been spent by them according to their own statement to Madame Fremon, at Madame Auguste Chouteau's, an intelligent French lady, and old family friend, residing in the city. She also testified that they were on terms of social intercourse with other intelligent and respectable French families in the city. One of them also remarked in presence of, Madame Labeaume, at dinner, (after having reacknowledged the deed in court) that Madame L., having made so good a bargain, ought to give them something in addition; and this, too, was complied with, by presenting them with a new umbrella—appropriate, as it was remarked, in consequence of the inclemency of the day, and with which they professed themselves very well satisfied. Having thus traced the transac-

tion through all its stages, from the first open commencement at nego-tiation down to the present or keepsake with which it is even yet usual, in places, to wind the matter up, it would seem that the pretence of surprise or imposition was put to open shame.

As to their alleged deficiency of understanding, it is not only not made out, but absolutely disproved by the aggregate array of tes-timony which has been spread upon the record. That they, were not as intelligent as Labeaume, or not as sagacious in bargaining as the American population generally, is not the question here.   They appear to have been at least intelligent enough to comprehend that their father had once fully sold the land, and been as fully paid for it by the father of the defendants, and that whatever color of claim they might have in law, (if any) being at least unsustained by morality or by conscience, was of a nature, which, if not addressing itself wholly to the conveni-ence and the liberality of the Labeaumes on the one hand, emphatically appealed more legitimately to their own good faith and honor on the other, than to all other considerations which then or afterwards ought to have influenced their conduct or swayed their decision.   If in refer-ence to the strictly legal rights to which it is now claimed they were entitled, they remained comparatively uninformed during their weeks sojurn in St. Louis, it was perhaps because to the bench and the bar of that period, as well as the present, a more perplexing and doubtful issue could not have been presented than one dependant upon the solu-tion of the various questions presented by this record up to the date of the deed of 1836.   This will be too readily inferred from the arguments and authorities of the learned and ingenious counsel on either side to need recapitulation here ; so that putting the action of the parties to the deed of relinquishment even upon the naked ground of a contract between strangers, we might find ourselves hesitating as to disturbing it on the score of inadequacy, seeing that no person could then have realized to himself that he was certainly negotiating in reference to anything save an expensive and vexatious term of doubtful litigation.   It would there-fore be to mar the real dignity of the law, which encourages and up-holds all reasonable facts for peace and quiet, were we thus to pervert it to the purpose of undoing one so apparently honorable, magnanimous and just to all the parties concerned in the present case—not strangers or speculators, but the exact reverse.

It may perhaps be as well to add in this connection, and in conclu-sion, that the testimony by no means discloses either such a condition of extreme necessity or distress on the part of the grantors or relin-quishers in the deed of 1836, or that they were so influenced by appre-

hensions concerning a suit, as that from either cause their free agency was necessarily, in any respect, unduly warped or improperly influenced. Much less can either of these be relied upon as a ground for vacating a deed which appears not to have been obtained stealthily or in haste, but to have been deliberately considered, and deliberately and willingly entered into, after weeks of probable (at least accessible) counsel, and consequent mature deliberation. According to the shewing of the bill itself, the grantors in the deed of relinquishment seem to have been made indirectly but sufficiently aware, by Labeaume himself, that during the period of inquiry and reflection referred to, they could bargain with, and " sign for any one else," so that neither in this repect, nor in respect to that unconscientious description of fraud, which Lord Hardwick defines to be "such bargains as no man in his senses and not under delusion would make, on the one hand, and as no honest and fair man would accept, on the other," can this transaction be legitimately disturbed. We are impressed, in short, that it was not only right and proper to do what was done, but that as it was performed by the proper parties, in a proper manner, this court can never more nearly approximate the line of equity and of right between the descendants of the deceased original parties to this transaction, than by rendering its unqualified sanction to what was so well done amongst and between themselves, and that, therefore, the decree of the circuit court, which very properly dismissed the bill of the complainants, should be, as it hereby is, affirmed.